[Cite as *Clinton v. Faurecia Exhaust Sys., Inc.*, 2012-Ohio-4618.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MIAMI COUNTY**

| | | |
|---|---|---|
| DARRELL T. CLINTON | : | |
| | : | Appellate Case No. 2012-CA-1 |
| Plaintiff-Appellant | : | |
| | : | Trial Court Case No. 10-CV-232 |
| v. | : | |
| | : | |
| FAURECIA EXHAUST SYSTEMS, | : | (Civil Appeal from |
| INC., et. al. | : | Common Pleas Court) |
| | : | |
| Defendant-Appellees | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 5th day of October, 2012.

. . . . . . . . . .

FRANK M. PAYSON, Atty. Reg. #0055165, The Law Offices of Frank M. Payson, P.C., 120 West Second Street, Suite 400, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellant

KATHLEEN M. ANDERSON, Atty. Reg. #0074422, and JASON T. CLAGG, Atty. Reg. #0002257, Barnes & Thornburg LLP, 600 One Summit Square, Fort Wayne, Indiana 46802
        Attorneys for Defendant-Appellees

. . . . . . . . . . . .

FAIN, J.

{¶ 1}    Plaintiff-appellant Darrell Clinton appeals from a summary judgment

rendered in favor of defendant-appellee Faurecia Exhaust Systems, Inc. Clinton contends that the trial court erred in excluding two items of evidence: an errata sheet to Clinton's deposition and parts of an affidavit Clinton filed in opposition to Faurecia's summary judgment motion. Clinton further contends that the trial court erred in failing to consider evidence supporting Clinton's hostile work environment racial harassment claim, in applying incorrect summary judgment standards, and by granting summary judgment on claims not properly addressed by Faurecia.

{¶ 2} Assuming for the sake of argument that the trial court erred in excluding the errata sheet and in failing to consider whether Clinton's affidavit contradicted or supplemented his deposition testimony, neither error was prejudicial. Even if the substituted and added testimony is construed in Clinton's favor, Clinton failed to provide evidence indicating that summary judgment should not be granted. We also conclude that the trial court applied proper summary judgment standards. Accordingly, the judgment of the trial court is Affirmed.

## I. Facts and the Course of Proceedings

{¶ 3} The facts, construed most favorably to Clinton, are as follows. In 2007, Darrell Clinton began working as a temporary employee at Faurecia. Clinton had been assigned to Faurecia by Patrick Staffing, a temporary staffing agency, and had previously been placed at various work sites.

{¶ 4} Clinton was assigned to be a General Operator, a job that involved lifting and carrying up to 50 pounds, pushing and pulling loaded hand trucks, and standing most of the

shift. The job also involved bending and twisting, with some reaching required. During his shift, Clinton had to maneuver pipes weighing twenty to twenty-five pounds. He had to get the pipe and load it up high, about a foot above shoulder level.

{¶ 5} On his first day of work, Clinton received orientation in a conference room at Faurecia. On that day, Clinton saw an item that he later realized was a noose, but he could not tell exactly what it was at the time. The next day, when Clinton reported to work, he had a plain view of the noose, which was right across from his work station. The noose was located on a pole in a maintenance cage. Clinton interpreted the noose as a threat. When he complained to a "gap leader," Eric Hensley, about the noose, Hensley said, "It's not mine. Do you see a white cone on my head?" Clinton deposition, p. 35, attached to the Faurecia Motion for Summary Judgment.

{¶ 6} According to affidavits submitted by Faurecia, gap leaders are not supervisors; they are hourly employees who assist in the assignment of duties and help workers. Faurecia also submitted evidence indicating that Hensley had no authority to discipline, hire, promote, or hire other employees.

{¶ 7} Clinton testified that he was exposed to racial comments from white employees after he began work. The majority of comments appear to have come from James, another gap leader, and two welders who worked in the back. Between the time Clinton began work and when he complained to Human Resources, James made racial references on occasion. For example, during lunch breaks, James told jokes freely, using the "N" word. Clinton also heard the two welders use the "N" word, but did not talk with them directly. At some point, when Clinton was taking a restroom break, Hensley told Clinton to "get his black

ass" back to his bender (work station).

{¶ 8}    After the noose had remained in place for two weeks, Clinton took a picture of it.  Clinton stated in his deposition that he did not tell anyone at Faurecia or Patrick Staffing that he had taken a photograph.   He later stated in an affidavit that he had told Cordell Holly, another African-American employee, about the picture.  Clinton also complained about the noose and racial comments to Jeri Oliver, the Faurecia Human Resources Manager.   After he complained, Oliver went over to the maintenance cage and took down the noose.   Oliver stated that the noose was nothing racial, because "they" did not think that way at Faurecia. Upon investigation, Faurecia determined that the noose, reported for the first time shortly after Halloween, was not race-related, but was part of a Halloween display put together by an hourly employee.   (The noose remained well after Halloween.)

{¶ 9}    After the noose was removed, Clinton overheard a comment to the effect that "I don't know why ni\*\*\*rs like to take things personal.  It's just a rope.  There was nothing going to happen."  Clinton deposition, pp. 71-72.  Clinton indicated during his deposition that this comment was made by a person who worked in the back, and who was neither a supervisor nor manager.  Clinton reported the comment to a supervisor.

{¶ 10}    After the noose was removed, James and Hensley continued to make occasional "little black jokes."   Id. at 73.   At his deposition, Clinton identified three comments that were made during this period – one of which involved James saying something unspecified that he would like to do to black people; a second comment that was not included in the deposition excerpts attached to Faurecia's motion; and a third comment made by Hensley, concerning whether black people eat fried chicken on weekends or whether they like

steaks.   Id. at 73-76.[1]

{¶ 11}    Subsequently, on December 20, 2007, Clinton was either injured at work after being hit in the chest with an eight-inch pipe, or simply reported chest pains that were unconnected to an injury.[2]   Clinton was taken to the emergency room, where he was given pain medication and nitroglycerin pills.   Clinton received a statement from the doctor with work restrictions, and took the statement back to Faurecia that evening.   Clinton gave the statement to an individual named Matt, who was a third-shift supervisor.   Matt told Clinton that he would not be working the rest of the evening due to his injury, so Clinton went home. In his affidavit opposing summary judgment, Clinton also stated that Matt had said there was nothing for Clinton to worry about, that he would not lose his job because of the accident.

{¶ 12}   The form that Clinton returned to Faurecia indicated that Clinton could return to work with the following restrictions: no lifting of any weight, no pushing or pulling, and no reaching above shoulder level.   The following day, on December 21, 2007, Clinton was told by Patrick Staffing that he would not be needed any more at Faurecia.

{¶ 13}   Faurecia's Human Resources Manager, Jeri Oliver, retired in mid-December 2007, and her position was assumed by John Plenzler. According to Plenzler, Faurecia's standard practice was to end the temporary assignments of workers who had medical

---

[1]    Clinton's deposition was not filed with the trial court; only selected excerpts were submitted with Faurecia's motion for summary judgment.    The trial court noted that it would consider the deposition even though it had not been filed in accordance with Civ. R. 56(C), because neither side had objected.

[2]    There is a conflict in this regard between Clinton's deposition and affidavit testimony, which claim injury due to the pipe, and the documents attached to Clinton's deposition, which indicate that he simply complained of pain in his chest and arm, and stated that he had the pain previously.    This conflict is immaterial for purposes of summary judgment, because there is no claim that the injury was the result of racial discrimination.

restrictions preventing them from safely performing the essential elements of their positions. Plenzler also stated that Faurecia did not hold positions open for temporary workers with less than one year service if they had medical restrictions preventing them from performing their jobs.

{¶ 14} Faurecia also presented evidence from Beth Brandenberry, a Human Resources Generalist employed at Faurecia. Brandenberry identified the health care provider's note regarding Clinton that Faurecia had received on December 21, 2007. Given these work restrictions, Clinton was not able to hold his temporary work assignment with Faurecia. Medical paperwork that Clinton turned in after seeing a health care provider indicated that he had medical restrictions that were inconsistent with the safe performance of his duties. Brandenberry stated that assignments of temporary workers through Patrick Staffing would end if the workers had restrictions from a health care provider preventing them from performing their duties. Consequently, Clinton's temporary work was ended in the normal course due to work restrictions. Brandenberry also indicated that when Clinton's work assignment ended, she was unaware that he had made any complaint of harassment. She was aware of a complaint about a noose or rope, but believed that the incident had been reported by a different employee, Cordell Holly. After investigation, the company determined that the rope, reported for the first time shortly after Halloween, was not race-related, but had been placed there as part of a Halloween display put together by a Faurecia hourly employee.

{¶ 15} Clinton did not make an attempt to have his work restrictions removed after being terminated. He subsequently filed suit against Faurecia and Patrick Staffing in March

2010. Clinton's complaint contained eight counts, including claims based on: race discrimination in violation of R.C. 4112.02; negligent retention of an employee; failure to properly supervise; negligence; retaliation; infliction of emotional distress, respondeat superior/ratification; and entitlement to punitive damages.

{¶ 16}   Discovery and other trial-related dates were set, and Clinton's deposition was taken in March 2011.   Faurecia then filed a motion for summary judgment in August 2011, attaching excerpts from Clinton's deposition, which had been transcribed.   Clinton had apparently not signed the deposition within thirty days after it was taken, and the court reporter attached a sheet to the deposition indicating that the deposition had not been read, signed, or examined within thirty days.

{¶ 17}   Subsequently, in mid-September 2011, Clinton reviewed the deposition and changed certain answers.   For example, in contrast to his prior testimony, he now contended that the individuals who had made the racially-charged statements were supervisors.   As a basis for the change, Clinton alleged that he had been confused by the questions.   Clinton also incorporated the errata sheet into his affidavit opposing summary judgment, to explain answers that were inconsistent with his deposition testimony.

{¶ 18}   In responding to Faurecia's summary judgment motion, Clinton included his own affidavit and the affidavit of Billy Satterwhite, a former Faurecia employee who was terminated in 2001, for allegedly testing positive for drugs.   Satterwhite stated that he had been employed at Faurecia from 1996 to 2001, and that before he was fired, he and other African-American workers were subjected to racial harassment and racial baiting by white workers.   Satterwhite stated that the harassment consisted of the following items: (1) his

coffee had been spiked so he would test positive for drugs in a urine test; (2) the legs were cut off his chair so he would fall when trying to sit down; (3) a female worker was paid to throw a pie in his face; (4) Ku Klux Klan pamphlets were passed around and were left on cars in the parking lot; (5) a white worker had a hangman's noose on the rear-view mirror of his truck; and (6) a clay penis and testicles were left on his desk. Satterwhite expressed the opinion that Faurecia had a racial discrimination problem existing as of the present time that it had not corrected, although he did not provide any details indicating his source of information or why he said this.

{¶ 19} Faurecia filed a motion to strike Satterwhite's affidavit, because it had not been provided in response to discovery requests, nor had a claim of attorney-work product been timely asserted. Faurecia also asked the trial court to strike the deposition errata sheet because it was untimely and did not set forth adequate reasons for the contradictions of prior testimony. Finally, Faurecia requested that the court disregard parts of Clinton's affidavit, which contradicted his prior deposition testimony.

{¶ 20} The trial court overruled the motion to strike with regard to Satterwhite's affidavit, concluding that Faurecia had not taken action to contest the failure to disclose the affidavit, even though Faurecia knew of its existence well before the discovery deadline had passed. The court sustained the motion to strike the errata sheet, based on Clinton's failure to offer sufficient reasons for the changes in his testimony. In addition, the court sustained the motion to strike the parts of Clinton's affidavit that contradicted his prior testimony, because the affidavit made no attempt to explain why the testimony had changed, other than incorporating the errata sheet, which the court had already found insufficient.

{¶ 21} In addition to changing various deposition answers, Clinton's affidavit also stated that he became offended and afraid for his life after discovering the hangman's noose. Clinton further stated in his affidavit that he was offended and scared by the comment from his "manager/supervisor" regarding whether black people like fried chicken or steak. Clinton also stated that his injury occurred when he was distracted by other workers and was hit by a pipe. Clinton did not say that anyone at Faurecia hit him with a pipe; he claimed that he was hit by the pipe because he was distracted, looking over his shoulder to make sure he would not be attacked.

{¶ 22} After considering the motion for summary judgment and Clinton's response, the trial court considered each of Clinton's claims, and concluded that summary judgment should be rendered in favor of Faurecia, based on the undisputed facts. Clinton appeals from the judgment rendered in Faurecia's favor.

## II. Assuming that the Trial Court Erred in Excluding Clinton's Errata Sheet, the Error Was Harmless

{¶ 23} Clinton's First Assignment of Error is as follows:

THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF PLAINTIFF BY EXCLUDING FROM EVIDENCE PLAINTIFF'S TESTIMONY THAT HE HAD READ AND CORRECTED HIS DEPOSITION.

{¶ 24} Under this assignment of error, Clinton contends that the trial court erred in failing to consider the changes in the deposition testimony, because courts are required to consider any changes in form or substance of deposition testimony, even if the change is not

supported by convincing explanations.

{¶ 25}    Civ R. 30 (E) provides that:

When the testimony is fully transcribed, the deposition shall be submitted to the witness for examination and shall be read to or by the witness, unless examination and reading are waived by the witness and by the parties.  Any changes in form or substance that the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them.  The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill, cannot be found, or refuses to sign.  The witness shall have thirty days from submission of the deposition to the witness to review and sign the deposition. * * * If the deposition is not signed by the witness during the period prescribed in this division, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed, unless on a motion to suppress the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

{¶ 26}      "[A] trial court's ruling on the use of the deposition of a witness is reviewed under an abuse-of-discretion standard."  *Bishop v. Ohio Bur. of Workers' Comp.*, 146 Ohio App.3d 772, 2001-Ohio-4274, 768 N.E.2d 684, ¶ 53 (10th Dist.).  An abuse of discretion means that the trial court must have acted "arbitrarily, unreasonably or unconscionably."  *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

**{¶ 27}** In the case before us, the trial court sustained the motion to strike the errata sheet, based on Clinton's failure to offer sufficient reasons for the changes in his testimony. Assuming for purposes of argument that the court erred in excluding the errata sheet, any error would not be grounds for reversal unless the error were prejudicial.

**{¶ 28}** Clinton contends that issues of fact would be presented if the trial court had considered the errata sheets, but fails to state what issues of fact would be presented. For reasons that will be apparent in our later discussion, we conclude that even if the trial court had erred in excluding the errata sheets, the evidence in the record does not create genuine issues of material fact precluding summary judgment. Accordingly, any alleged error would have been harmless and does not provide a basis for reversal.

**{¶ 29}** The First Assignment of Error is overruled.

**III.   Assuming that the Trial Court Erred in Striking Parts of Clinton's Affidavit, the Error Was Harmless**

**{¶ 30}** Clinton's Second Assignment of Error is as follows:

THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF PLAINTIFF BY EXCLUDING FROM EVIDENCE PLAINTIFF'S TESTIMONY IN THE FORM OF HIS SUMMARY JUDGMENT AFFIDAVIT.

**{¶ 31}** Under this assignment of error, Clinton contends that the trial court erred in striking the parts of Clinton's affidavit that contradicted his deposition. The court concluded that the parts of Clinton's affidavit that contradicted his deposition testimony should be struck because Clinton failed to explain why his testimony had changed. Although the court noted

that Clinton had supplied explanations in his errata sheet, which was incorporated into his deposition, the court rejected these reasons because it had already found the reasons insufficient for purposes of the errata sheet. Clinton argues that the court should have considered whether the testimony supplemented deposition testimony rather than contradicting it, and also should have evaluated whether the reasons were adequate.

{¶ 32} In *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, the Supreme Court of Ohio stated that:

"Ordinarily, under [Civ.R.] 56(C), when an affidavit is inconsistent with affiant's prior deposition testimony as to material facts and the affidavit neither suggests affiant was confused at the deposition nor offers a reason for the contradictions in her prior testimony, the affidavit does not create a genuine issue of fact which would preclude summary judgment." We hold that an affidavit of a party opposing summary judgment that contradicts former deposition testimony of that party may not, without sufficient explanation, create a genuine issue of material fact to defeat a motion for summary judgment. (Citation omitted.) *Id*. at ¶ 28.

{¶ 33} After making these remarks, the Supreme Court of Ohio held that trial courts must first consider if affidavits contradict, or merely supplement, earlier sworn testimony. Further, the contradictory affidavit must sufficiently explain the contradiction before it can create a genuine issue of material fact. *Id*. at ¶ 29. Because the appellate court in *Byrd* had not considered if the affidavit was sham, the Supreme Court reversed and remanded the case for consideration of that point. *Id*. at ¶ 30-31.

{¶ 34} In the case before us, the trial court did not consider Clinton's explanation for

the contradiction. In *Pettiford v. Aggarwal*, 126 Ohio St.3d 413, 2010-Ohio-3237, 934 N.E.2d 913, the Supreme Court of Ohio stressed that determining whether an affidavit contradicts a deposition "without a sufficient explanation for the alleged contradiction is a factual determination that is properly made by the trier of fact." *Id*. at ¶ 40. The court, therefore, remanded the matter to the trial court because the court had not expounded on its reasoning for granting the motion for summary judgment and had not ruled on a motion to strike the affidavit. The appellate court had also declined to apply the *Byrd* analysis to the affidavit, which was from an expert retained by one of the parties. *Id*. Under *Byrd* and *Pettiford*, we would normally reverse the trial court and remand the case, unless the content of the affidavit, construed in Clinton's favor, fails to create a genuine issue of material fact. However, even if we assume that the trial court erred in failing to consider the reasons for the changed testimony, we conclude that Clinton failed to raise genuine issues of material fact with regard to his claims. As a result, any error would have been harmless.

{¶ 35}  Clinton's Second Assignment of Error is overruled.

### IV.   The Trial Court Did Not Err in Failing to Consider

### Clinton's Claim of a Hostile Work Environment.

{¶ 36}  Clinton's Third Assignment of Error is as follows:

THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF PLAINTIFF IN FAILING TO CONSIDER ANY OF PLAINTIFF'S EVIDENCE SUPPORTING HIS HOSTILE WORK ENVIRONMENT RACIAL HARASSMENT CLAIM.

{¶ 37}  Under this assignment of error, Clinton contends that the trial court erred by failing to

consider a claim of hostile work environment racial harassment. Clinton acknowledges that the claim was not included as a separate count, but argues that racial harassment was fairly raised in the complaint. In response, Faurecia maintains that the matter was not properly raised. Faurecia further argues that even if racial harassment had been raised, summary judgment would have been warranted on this ground.

**{¶ 38}** The issue of racial harassment was addressed by both parties in the context of summary judgment, and Clinton did mention racial harassment and "race-baiting" a number of times in the complaint. He did not set this claim out as a separate count, and the trial court did not mention it when rendering summary judgment. Instead, the trial court's analysis was confined to the eight counts specifically designated as such in the complaint.

**{¶ 39}** We conclude that the complaint sufficiently raised a hostile work environment claim. Compare *Brown v. Dover Corp.*, 1st Dist. Hamilton No. C-060123, 2007-Ohio-2128 (noting that it was unclear under plaintiff's complaint whether her R.C. 4112.02(A) cause of action "was based on disparate treatment * * * or a hostile work environment, * * * but the evidence presented could have arguably implicated either theory. The denial of benefits and increased scrutiny suggested a disparate-treatment theory, but the distribution of racially offensive pictures and the noose supported a hostile-work-environment theory of racial harassment.") *Id*. at ¶ 14. (Footnotes omitted.)

**{¶ 40}** In the case before us, Clinton presented a claim for racial discrimination under R.C. 4112.02(A) in Count I of the Complaint, and alleged racial harassment throughout the complaint. The evidence, as in *Brown*, could have implicated either this theory or one of disparate treatment. Clinton also argued hostile work environment in responding to summary judgment. Accordingly, the trial court erred in failing to consider this issue. The

failure is prejudicial, however, only if the court erred in rendering summary judgment against Clinton.

**{¶ 41}** "We review summary judgment decisions de novo, which means that we apply the same standards as the trial court." *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.) "A trial court may grant a moving party summary judgment pursuant to Civ. R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." (Citation omitted.) *Smith v. Five Rivers MetroParks*, 134 Ohio App.3d 754, 760, 732 N.E.2d 422 (2d Dist. 1999).

Under the Revised Code, a plaintiff alleging a hostile work environment must establish that (1) the employee was a member of a protected class, (2) the employee was subject to unwelcome harassment, (3) the harassment complained of was based on race, (4) the harassment had the purpose or effect of unreasonably interfering with the employee's work performance or creating an intimidating, hostile, or offensive work environment, and (5) respondeat superior liability existed. *Brown,* 2007-Ohio-2128, ¶ 38, citing *Delaney v. Skyline Lodge, Inc.*, 95 Ohio App.3d 264, 642 N.E.2d 395 (1st Dist. 1994), and *Long v. Ford Motor Co.*, 193 Fed.Appx. 497 (6th Cir. 2006).

**{¶ 42}** The United States Supreme Court has indicated that discrimination occurs when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' * * * that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment' * * * ." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).    However, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview."   *Id.*

> [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances.   These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.   The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.   But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.   510 U.S. at 23.

**{¶ 43}** Discriminatory comments are, without doubt, offensive and inappropriate in the workplace.   Nonetheless, even if we construe the facts in Clinton's affidavit and deposition in his favor, there is no evidence that the harassment was either severe or pervasive.

**{¶ 44}**    In his deposition, Clinton mentioned a few people who made racist jokes or comments for about two weeks after Clinton began working at Faurecia.   However, there is no evidence that the individuals who made the alleged remarks were supervisors, that their alleged actions were committed within the scope of their agency from Faurecia, or that the remarks were physically threatening.

**{¶ 45}** In this regard, we note that Clinton's affidavit attempted to change his deposition testimony, which indicated that the individuals making remarks were not supervisors.   Clinton stated in his affidavit that the individuals making remarks were, in fact,

mangers and supervisors. His attempt to change his testimony was not supported by any explanation, other than the notation in his errata sheets that he was "confused" by the question in his deposition. However, even if we accept as true Clinton's belief that these persons were supervisors, the undisputed facts indicate that they were not, in fact, persons who were supervisors or had authority in any way to speak for Faurecia.

{¶ 46} The individuals identified by Clinton were actually not supervisors, according to the affidavits filed by human resource officials of Faurecia. For example, an individual identified as Eric Hensley, who is alleged to have told Clinton to "get his black ass" back to his bender, was not a supervisor and had no authority to discipline other employees.

{¶ 47} In order to establish a claim under the doctrine of respondeat superior, it must be demonstrated that a principal-agent relationship existed, and that tortious conduct was committed by the agent while in the scope of his agency. *Hanson v. Kynast*, 24 Ohio St.3d 171, 173, 494 N.E.2d 1091 (1986). Clinton failed to offer any evidence that the individuals who made the offending remarks were Faurecia's agents or were acting within the scope of their agency. Instead, the undisputed facts indicate that these individuals, in making offensive remarks, were acting on their own, not on behalf of the company. Consequently, there is no *respondeat superior* liability on Faurecia's part, and no liability for the alleged workplace harassment.

{¶ 48} In *Hidy Motors, Inc. v. Sheaffer*, 183 Ohio App.3d 316, 2009-Ohio-3763, 916 N.E.2d 1122 (2d Dist.), we considered a hostile work environment claim in an age discrimination context. The employee left his job for another position, allegedly because of various offensive remarks that the general manager of Hidy Motors had made about his age.

Id. at ¶ 23-31. Although we believed that the employee was facing an "uphill battle," we concluded that summary judgment should not have been rendered on the constructive discharge claim. Id. at ¶ 31. In contrast to the case before us, however, the individual involved in the alleged harassment in *Hidy Motors* was the general manager of the company.

{¶ 49} Moreover, even if the individuals had been supervisors, Clinton did not suffer an adverse employment action due to the alleged harassment, because his employment ended, not because of discrimination on the part of Faurecia, but because he could not physically perform his job. In this regard, the undisputed testimony was that Clinton provided Faurecia with a medical note prohibiting him from physically performing the job to which he had been assigned. The undisputed evidence also indicates that assignments of temporary workers at Faurecia end if the workers have work restrictions from a health care provider that prevent the workers from performing their duties. The undisputed evidence further indicates that Faurecia has a policy of not holding positions open for temporary workers with less than one year of service if the workers have medical restrictions that prevent them from performing their duties. Thus, there is simply no evidence that Clinton's discharge was related to a hostile work environment.

{¶ 50} As an additional matter, when the alleged harassment regarding the noose was brought to the attention of Faurecia's Human Resources department, the noose was promptly removed. Thus, when Faurecia was notified of an issue, it took action to remedy the matter.

{¶ 51} Clinton did present an affidavit from a former employee, Billy Satterwhite,

who maintained that discrimination existed at Faurecia prior to the time Satterwhite was terminated in 2001. This evidence is too remote in time to provide support for Clinton's claims. Satterwhite was terminated in 2001, many years before Clinton's employment, and there is no indication that any of the employees who allegedly harassed Satterwhite were still employed at Faurecia in 2007. We note that no attempt was made to identify any of these employees or to connect them with current alleged discriminatory behavior.

{¶ 52} Accordingly, even if the trial court erred in failing to consider the issue of a hostile work environment claim, no substantial prejudice occurred, because Clinton failed to set forth evidence raising genuine issues of material fact regarding this claim.

{¶ 53} Clinton's Third Assignment of Error is overruled.

## V. The Trial Court Did Not Err in Failing to Apply a "Mixed-Motive" Standard to Clinton's Claims

{¶ 54} Clinton's Fourth Assignment of Error is as follows:

THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF PLAINTIFF BY UTILIZING THE INCORRECT SUMMARY JUDGMENT STANDARD IN EVALUATING PLAINTIFF'S EVIDENCE AND CONSEQUENTLY IMPROPERLY GRANTING SUMMARY JUDGMENT TO DEFENDANT.

{¶ 55} Under this assignment of error, Clinton contends that the trial court should have applied the standard used in "mixed-motive" cases, in which a plaintiff need only show that a protected characteristic like race played a role, "no matter how minute," in an employment decision. Clinton Appellate Brief, p. 19. As support for this contention, Clinton relies on *White v. Baxter*

*Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008).

**{¶ 56}** In *White,* the Sixth Circuit Court of Appeals clarified its standard for analyzing "mixed-motive" cases, which involve an alternate method of proving an unlawful employment action. This method was first adopted in the Civil Rights Act of 1991. *Id*. at 396-397. In 1991, Congress passed 42 U.S.C. 2000e-2(m) as part of the Civil Rights Act, for the purpose of addressing a prior decision of the United States Supreme Court, which had allowed employers to avoid Title VII liability by demonstrating that they would have made the same employment decisions even if they had taken protected characteristics into account. 538 F.3d at 396 (referring to *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) and 42 U.S.C. 2000e-2(m), which states that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.")

**{¶ 57}** The Sixth Circuit noted in *White* that federal courts use various standards to analyze mixed motive claims. The Sixth Circuit then adopted its own standard for mixed-motive cases, which rejects use of the *McDonnell-Douglas/Burdine* burden-shifting framework. *Id*. at 400, referring to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Thus, the Sixth Circuit held that:

[T[o survive a defendant's motion for summary judgment, a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) "race, color, religion, sex, or national origin was a motivating factor" for the

defendant's adverse employment action. 42 U.S.C. § 2000e-2(m) (emphasis added). See Wright, 455 F.3d at 716 (Moore, J., concurring) ("[A]n employee raising a mixed-motive claim can defeat an employer's motion for summary judgment by presenting evidence-either direct or circumstantial-to 'demonstrate' that a protected characteristic 'was a motivating factor for an employment practice, even though other factors also motivated the practice.' " * * *) This burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim. *White,* 533 F.3d at 400.

{¶ 58} Ohio's anti-discrimination statutes do not contain a provision analogous to 42 U.S.C. 2000e-2(m), and the few Ohio courts that have considered mixed-motive claims differ in their approach. Compare *Veal v. Upreach, L.L.C.*, 10th Dist. Franklin No. 11AP–192, 2011-Ohio-5406, ¶ 31 (noting that "* * * it is less than settled whether mixed-motive claims are viable in the context of R.C. 4112.02(A) * * *," and refusing to address the claim, because plaintiff failed to present evidence establishing an adverse employment action under this theory) with *Varner v. Goodyear Tire & Rubber Co.*, 9th Dist. Summit No. 21901, 2004-Ohio-4946, ¶ 23 (applying "mixed-motive" framework without analysis, and rejecting the claim because the plaintiff failed to present evidence contradicting her employer's evidence regarding the reason for termination).

{¶ 59} ) We need not address this point, however, because Clinton failed to present any evidence about a "mixed-motive" for his discharge. Faruecia did not cause Clinton's injury; it simply responded to a situation that Clinton created by becoming injured and being

unable to perform his duties. Furthermore, there is no evidence that Faurecia did anything other than follow its normal procedures following injury to a temporary worker.

**{¶ 60}** Clinton also mentions the retaliation claim in this regard, apparently under the theory that Faurecia retaliated against him because he brought racial complaints to the attention of the Human Resource Department. Again, however, there is no evidence of either retaliation or wrongful discharge.

> In order to establish a prima facie case of discriminatory treatment under R.C. 4112.02(A), a plaintiff must prove that (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position he held, and (4) he was either replaced by someone outside the protected class or was treated less favorably than a similarly situated employee not in the protected class. *Holbrook v. LexisNexis*, 169 Ohio App.3d 345, 2006-Ohio-5762, 862 N.E.2d 892, ¶ 23 (2d Dist.). (Citations omitted.)

**{¶ 61}** Clinton is a member of a protected class, and did suffer an adverse employment action, in that he was discharged. Clinton was qualified for the position, or at least he testified that he had no disciplinary issues or other problems while at Faurecia. Clinton failed to present any evidence, however, indicating that he was treated less favorably than workers outside the protected class. In other words, Clinton failed to present any evidence indicating that other temporary workers outside the protected class were retained if they were medically unable to perform their jobs. This type of information should have been available in discovery.

**{¶ 62}** Second, regarding retaliation:

Ohio law prohibits retaliating against an employee who has opposed any unlawful discriminatory practice or has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under R.C. 4112.01 through 4112.07. R.C. 4112.02(I). When analyzing retaliation claims, Ohio courts rely on federal case law. *Chandler v. Empire Chem., Inc., Midwest Rubber Custom Mixing Div*. (1994), 99 Ohio App.3d 396, 402, 650 N.E.2d 950, 954. To prove a claim of retaliation, a plaintiff must establish three elements: (1) that she engaged in protected activity, (2) that she was subjected to an adverse employment action, and (3) that a causal link exists between a protected activity and the adverse action. Once a plaintiff successfully establishes a prima facie case, it is the defendant's burden to articulate a legitimate reason for its action. If the defendant meets its burden, the burden shifts back to the plaintiff to show that the articulated reason was a pretext. *Peterson v. Buckeye Steel Casings,* 133 Ohio App.3d 715, 727, 729 N.E.2d 813 (10th Dist.1999).

{¶ 63} The only evidence in this regard was that Jeri Oliver, the Human Resource Manager who had handled Clinton's complaints, had retired more than a week before Clinton's injury. The person who actually handled Clinton's discharge was not aware that Clinton was the person who had complained about the noose; instead, she was under the impression that the complaint had been registered by a different employee (Cordell Holly). Furthermore, there was no evidence presented to indicate that Faurecia did anything other than follow standard procedures when Clinton was discharged. Clinton, therefore, failed to present genuine issues of material fact regarding the existence of a prima-facie case of

discrimination, nor did he present genuine issues of material fact regarding retaliation.

{¶ 64}   Accordingly, the trial court did not err in rending summary judgment on Clinton's claims under R.C. 4112.02.   The Fourth Assignment of Error is overruled.

## VI. The Trial Court Did Not Err in Rendering Summary Judgment on Clinton's Remaining Claims

{¶ 65}   Clinton's Fifth Assignment of Error is as follows:

> THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF PLAINTIFF BY GRANTING SUMMARY JUDGMENT TO DEFENDANT ON CLAIMS NOT PROPERLY ADDRESSED BY DEFENDANT.

{¶ 66}   Under this assignment of error, Clinton contends that Faurecia failed to address Clinton's other causes of action or made conclusory statements without showing that there were no material facts remaining for trial with respect to the claims for punitive damages, negligent retention of employees, failure to properly supervise, and respondeat superior/retaliation.   We disagree.

> To prevail on a motion for summary judgment, the party moving for summary judgment must be able to point to evidentiary materials that show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.   The nonmoving party must then present evidence that some issue of material fact remains for the trial court to resolve.   *Hurchanik v. Swayze*, 173 Ohio App.3d 760, 2007-Ohio-6166, 880 N.E.2d 503, ¶ 23 (12th Dist.), citing *Dresher v.*

*Burt ,*75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996).

**{¶ 67}** We have reviewed the entire record, including the motion for summary judgment, Clinton's response to the summary judgment motion, and Faurecia's reply memorandum in support of summary judgment. Faurecia specifically mentioned each claim in the complaint, other than the punitive damages claim, and pointed out why Clinton's evidence did not establish genuine issues of material fact. Clinton then had the burden to present evidence of issues of material facts. We will address the claims separately, even though Clinton has not specifically mentioned in his brief why summary judgment on the remaining claims is inappropriate.

### A. Negligent Retention and Supervision

**{¶ 68}** The elements necessary to prove negligent supervision are as follows:

(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries. *Cooke v. Montgomery Cty.*, 158 Ohio App.3d 139, 2004-Ohio-3780, 814 N.E.2d 505, ¶ 23 (2d Dist.)

**{¶ 69}** The same elements apply to claims of negligent retention. *Hidy,* 183 Ohio App.3d 316, 2009-Ohio-3763, 916 N.E.2d 1122, ¶ 38, In *Hidy*, we noted that "harassing behavior is per se incompetent behavior." Id. at ¶ 39. Therefore, for purposes of analysis, we assume that the employees identified by Clinton – James (whose last name was never disclosed), Eric Hensley, and two unnamed welders who worked in the back – were incompetent in this regard. No evidence was

presented to indicate that Faurecia was actually or constructively aware of their incompetence before the alleged offensive actions occurred. When Faurecia was notified of the noose and complaint about comments, the noose was promptly taken down. An investigation also revealed no discriminatory basis for the display.

**{¶ 70}** As noted, Clinton attempted to provide evidence of Faurecia's knowledge of employee harassment, by referring to acts that had occurred many years earlier. However, even if this testimony is construed in Clinton's favor, there is no indication that the events that occurred several years later were caused by the same employees or that any connection existed.

**{¶ 71}** Furthermore, we have already concluded that Clinton failed to present evidence of genuine issues of material fact regarding an injury alleged to have been proximately caused by workplace harassment or his discharge. Thus, the trial court did not err in rending summary judgment in Faurecia's favor on claims of negligent supervision and retention of employees.

### B. Negligence and Retaliation

**{¶ 72}** Clinton also alleged in the complaint that Faurecia was negligent because it knew of racial baiting and harassment, but failed to warn Clinton of the dangers. "To sustain an action in negligence, a plaintiff must demonstrate that the defendant had a duty, recognized by law, requiring him to conform his conduct to a certain standard for the protection of the plaintiff, that the defendant failed to conform his conduct to that standard, and that the defendant's conduct proximately caused the plaintiff to sustain actual loss or damage." *Phillips v. Dayton Power & Light Co.*, 93 Ohio App.3d 111, 116, 637 N.E.2d 963 (2d

Dist.1994). In view of our prior discussion, there are no genuine issues of material fact regarding Faurecia's breach of a duty owed to Clinton, nor about whether Faurecia's actions proximately caused damage to Clinton. Furthermore, we have previously discussed retaliation, and found no genuine issues of material facts in that regard, either.

### C. Intentional Infliction of Emotional Distress

**{¶ 73}** To establish a claim for intentional infliction of emotional distress, a plaintiff must prove that;

(1) the defendant either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to the plaintiff; (2) the defendant's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency"; (3) the defendant's actions were the proximate cause of plaintiff's psychic injury; and (4) the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it." A claim for intentional infliction of emotional distress must be based on more than "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." (Citations omitted.) *Harsh v. Franklin*, 2d Dist. Montgomery No. 24331, 2011-Ohio-2428, ¶ 20.

**{¶ 74}** Again, Clinton failed to raise genuine issues of material fact regarding this claim. There was no evidence presented to indicate that Faurecia knew or should have known that its actions or the actions of its employees would cause Clinton serious emotional distress.

### D. Respondeat Superior/Ratification

{¶ 75} Clinton's seventh claim in the complaint is based on a respondeat superior/ratification theory. "It is well-established that in order for an employer to be liable under the doctrine of respondeat superior, the tort of the employee must be committed within the scope of employment. Moreover, where the tort is intentional, as in the case at bar, the behavior giving rise to the tort must be 'calculated to facilitate or promote the business for which the servant was employed * * *.' " *Byrd v. Faber,* 57 Ohio St.3d 56, 58, 565 N.E.2d 584 (1991).

{¶ 76} " 'Ratification can be found in conduct of the principal, with full knowledge of the facts of the transaction, which either expressly manifests its intention to be bound by the acts of its agent or is inconsistent with an intention to repudiate the transaction entered by the agent.' " (Citations omitted). *Sandusky Housing Trust Ltd. Partnership v. Bouman Group*, 10th Dist. Franklin No. 91AP-1249, 1992 WL 158460, *4 (June 30, 1992).

{¶ 77} We have previously discussed the issue of respondeat superior, and found no basis for liability. Likewise, based on our prior discussion, there is no evidence raising genuine issues of material fact with regard to whether Faurecia ratified the acts of its employees.

### E. Punitive Damages

{¶ 78} Finally, Clinton contends that the trial court erred in failing to rule on the punitive damages claim, which was contained in the last count of the complaint. Punitive damages are not a separate cause of action; they are a remedy that can be awarded where actual damages have been established and the defendant's actions involve malice or other egregious behavior. See, *e.g.*, *Gollihue v. Consolidated Rail Corp.*, 120 Ohio App.3d 378,

400, 697 N.E.2d 1109 (3d Dist.1997). Because the trial court rendered summary judgment on Clinton's claims, no recovery of punitive damages would have been possible, and the court did not need to separately address the punitive damages issue,

{¶ 79} Clinton's Fifth Assignment of Error is overruled.


## VII. Conclusion

{¶ 80} All of Clinton's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

DONOVAN and HALL, JJ., concur.


Copies mailed to:

Frank M. Payson
Kathleen M. Anderson
Jason T Clagg
Hon. Christopher Gee